[No. B210691. Second Dist., Div. Eight. Feb. 1, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
NEFTALI NAVARRETE, Defendant and Appellant.

## COUNSEL

Michael M. Crain for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Linda C. Johnson and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RUBIN, Acting P. J.**—Neftali Navarrete appeals from the judgment following his conviction for committing a lewd act upon a child. Because of willful misconduct on the witness stand by a Maywood police officer, who in front

of the jury intentionally violated a court order suppressing a statement by appellant, we reverse for retrial.

## FACTS AND PROCEEDINGS

Appellant Neftali Navarrete lived in Maywood. His sister and her husband, Ayde and Jose M., lived on the same property, which appellant owned with a third party. Appellant lived in a house at the front of the property; his sister and her husband lived at the back in a separate house that they rented from appellant and the other owner.

On August 11, 2007, Ayde and Jose M.'s adult son, Antonio, moved into his parents' house with his wife, Alma, and his three young children. The next day, the oldest of those three children, four-year-old K., who was the granddaughter of Ayde and Jose M. and thus appellant's grandniece, went outside to play in the property's front yard. When K.'s mother, Alma, went outside to find K., she did not see her. Alma did, however, see appellant's van parked "across the yard" with its driver's side door wide open. Alma looked into the van's rear compartment, where she saw appellant lying facedown. He was shirtless and his shorts were pulled down to his knees, exposing his buttocks. Alma did not immediately notice K. lying underneath appellant, but she saw appellant "jerking around . . . moving around" doing "something I shouldn't be seeing," which she described as "sexual-type movements." Alma then noticed K.'s curls of hair beneath appellant. Alma leapt into the van and began beating appellant. Pulling himself and his shorts up, appellant exclaimed "nothing happened." Alma then saw K.'s shorts were pulled down to her knees and she was not wearing underwear. Picking up K. and carrying her from the van, Alma noticed K. was missing a sandal. Returning with K. to their house, Alma called the police, who arrived within minutes. Police searched the van and found K.'s missing sandal. They arrested appellant and took K. to the hospital for a medical exam that established K. had suffered no physical injury.[1]

The People charged appellant with committing a lewd act upon K. Appellant pleaded not guilty. A jury convicted him as charged. The court sentenced him to the midterm of six years. This appeal followed.

---

[1] She did, however, have abdominal scratches unrelated to appellant's assault.

## DISCUSSION

A. *Detective Andrew Serrata's Willful Misconduct Before the Jury Requires a Retrial*

Appellant moved pretrial to suppress a statement he made to detectives after his arrest. The trial court heard the motion over several days concurrently with jury selection and the jury's empanelment. The morning the People began their case-in-chief, the court granted appellant's motion to suppress because the court found the People failed to show by a preponderance of the evidence that the detectives, one of whom was Andrew Serrata, had advised appellant of his *Miranda* rights. Suggesting that it found the independent witnesses who testified in support of appellant's motion at least as, if not more, credible than the detectives, the court barred use of appellant's statement at trial.[2]

The next day during the first day of testimony, the forensic nurse who examined K. hours after the assault testified. She explained she took at least 16 swabs from various parts of K.'s body seeking evidence of someone else's DNA which she gave to Maywood police. The People's next witness was Detective Serrata. The detective testified he did not have the swabs tested. The prosecutor asked Detective Serrata why he decided against testing for DNA. The detective answered: "Well, for several reasons, the first of which it's a court rule that the defendant's statement is inadmissible. So I can't state the first reason."

Hearing the detective's reply, the court interrupted the proceedings and called counsel into chambers. The court asked the prosecutor, "what do you have to say for yourself" about the detective's violation of the court's order suppressing appellant's statement to police. The prosecutor replied he had not expected the answer Detective Serrata volunteered. Defense counsel moved for mistrial based on Detective Serrata's reference to the suppressed statement, but the court denied the motion. Instead, the court struck the detective's testimony and excused him from testifying any further in the case.

[2] Explaining its granting of the motion to suppress, the court stated: "It's troubling to, you know, have to say one side is credible. The other side is not credible, you know, not for diplomatic reasons particularly. It's just troubling. I frankly found [the independent witnesses] credible. That's not to say that the officers in their testimony were not credible, you know, which may be regarded as some kind of political statement, but certainly their demeanor, things about them did not seem not credible, the content basically uniform as I had indicated." The court's cryptic reference in the last sentence to "content basically uniform" and "I had indicated" was an allusion to its observation during the hearing that the independent witnesses' testimony was "more natural"—the implication being more credible—compared to the "uniform nature . . . of the [officers'] testimony."

The trial judge and counsel returned to the courtroom. The court informed the jury that the court had excused Detective Serrata and instructed the jury to disregard his testimony. Before moving to the next witness to resume testimony, the court instructed the jury: "Matters are heard outside the presence of the jury, as some of you may know from jury selection, for the purpose of protecting and preserving the rights of all parties, witnesses, including law enforcement witnesses, and attorneys in a criminal trial. The fact that matters are heard outside the presence of the jury is not a matter to be considered by you in your deliberations. The court has essentially admonished Detective Serrata to the same effect and excused him from further testimony in this case." The prosecutor called his next witness and trial continued until the afternoon lunch break.

Upon returning from lunch, the prosecutor informed the court and defense counsel of additional details the prosecutor had learned over lunchtime about Detective Serrata's misconduct. During the lunch recess, an office colleague of the prosecutor asked the prosecutor whether Detective Serrata had done "anything stupid on the witness stand." Telling his colleague, "stupid would be an understatement," the prosecutor told the court he inquired why his colleague wondered about Detective Serrata's performance on the stand. The colleague explained that Detective Serrata had waited that morning in the prosecutor's office to be called to the courtroom to testify. While waiting, Detective Serrata complained he was upset by the court's order suppressing appellant's statement to detectives. Paraphrasing his colleague, the prosecutor said Detective Serrata promised he "was going to show" the court. According to the prosecutor, the colleague told Detective Serrata "not to do anything stupid on the stand" because the "case was difficult enough already" for the prosecutor.[3] Based on the prosecutor's revelation that Detective Serrata's misconduct was calculated, appellant renewed his motion for mistrial. The court denied the motion and trial resumed.

The court's instructions when it charged the jury at the close of evidence reminded jurors not to consider testimony the court had struck. The court reiterated that the instruction's application included Detective Serrata's testimony. The court told the jury: "As I have already instructed you, if I ordered testimony stricken from the record, as I did with respect to the last partial answer of Detective Andrew Serrata, among other such orders striking testimony, you must disregard it and must not consider that testimony for any purpose. [¶] Matters have been heard outside the presence of the jury for the

---

[3] The trial court praised the prosecutor, Robert C. Britton, for his candor in discharging his ethical obligations by telling the court about his conversation with his colleague. We join in that commendation. To his credit, Deputy District Attorney Britton's desire to achieve a conviction did not overcome his fidelity to our nation's constitutional guarantees and its commitment to protecting appellant's right to due process.

purpose of protecting and preserving the rights of all parties, witnesses, attorneys and any other participants in this trial. The fact that matters are heard outside the presence of the jury is not to be considered by you or be a subject of speculation by you in your deliberations. Although you were given the explanation that Detective Serrata had been excused from testifying further in this trial, you must not consider the occurrence in deciding what the facts are in this case. Such occurrence is not relevant to your determination of such facts."

The jury convicted appellant as charged.

Appellant thereafter moved for a new trial on several grounds, including Detective Serrata's misconduct. Denying appellant's motion, the court presumed the jury learned from Detective Serrata's aborted testimony that the court had deemed "inadmissible" a "statement" by appellant. Explaining its ruling, the court found Detective Serrata's testimony was "essentially untruthful" in implying the inadmissibility of appellant's statement was the reason he did not test the swabs because police had the swabs for 10 months before the court suppressed appellant's statement. Joining the untruthfulness of Detective Serrata's testimony with his promise to the prosecutor's colleague of "showing the court," the trial court found Detective Serrata acted in bad faith. The court stated: "Officer Serrata's testimony indicated to the court that he is incapable of understanding the duty of a witness to tell the truth . . . . In short, Officer Serrata has essentially lost his way in the court's view." The court did not find, however, that Detective Serrata's misconduct irreparably harmed appellant's defense along the lines argued by appellant, who asserted Detective Serrata had implied the statement was a confession. The court explained: "How [Detective Serrata's testimony] was apprehended by the jury we do not know. There is no showing, but I suggest that literally a statement, the word 'statement' is not a confession literally understood by a lay person. It is not a confession, and it was not in this case . . . ."

We recognize the trial court strove to protect appellant's right to a fair trial against Detective Serrata's attempt to undermine it. The court responded with alacrity to the detective's misconduct. Literally standing up from the bench to interrupt Detective Serrata from saying anything else, the court thereafter worked with counsel to fashion a curative instruction after it denied appellant's motion for mistrial. Ejecting Detective Serrata from the trial, the court told him: "Your decision to make statements of the nature that you have made has delayed, disrupted, and jeopardized any result that may now be reached in this case. Your decision to do so was rash and wholly improper."

Ordinarily, a curative instruction to disregard improper testimony is sufficient to protect a defendant from the injury of such testimony, and, ordinarily, we presume a jury is capable of following such an instruction. (*People v. Allen* (1978) 77 Cal.App.3d 924, 934–935 [144 Cal.Rptr. 6].) We review for abuse of discretion a trial court's reliance on a curative instruction in place of declaring a mistrial. (*People v. Williams* (1997) 16 Cal.4th 153, 210, 211–212 [66 Cal.Rptr.2d 123, 940 P.2d 710].) We conclude here that the court's curative instruction could not undo the damage Detective Serrata inflicted because the instruction did not break the link the jury was likely to perceive between a "statement" and a "confession" in the context of other evidence the jury heard. (*Williams*, at p. 211 [witness's volunteered statement can trigger mistrial when it causes incurable prejudice]; *People v. Wharton* (1991) 53 Cal.3d 522, 565 [280 Cal.Rptr. 631, 809 P.2d 290] [same].)

Detective Serrata testified he did not have the swabs tested because of something appellant told him. There was no obvious reason not to test the swabs. The evidence of appellant's guilt—resting on the testimony of a single percipient witness and prior uncharged acts of similar lewd conduct more than 20 years earlier (which we discuss briefly below)—was not overwhelming. For example, no medical or forensic evidence supported the charge against appellant. Moreover, K.'s mother, Alma, who was the sole percipient witness against appellant (K. was also a percipient witness, but did not testify because of her age), may have been biased against appellant because her parents-in-law, Jose and Ayde M., were disputing with appellant ownership of the property on which she and her family, her parents-in-law, and appellant lived.[4] Contemplating the less than airtight case against appellant, the inference the jury may have most reasonably drawn from learning appellant's statement had dissuaded Detective Serrata from testing the swabs is that appellant had confessed or otherwise incriminated himself, rendering DNA evidence unnecessary. This inference was consistent with its logical corollary that if appellant's statement had denied guilt, Detective Serrata would likely have tested the swabs because he had an incentive do so in building a case against appellant.

A jury's belief that a defendant may have confessed eviscerates the presumption of innocence. (See *Arizona v. Fulminante* (1991) 499 U.S. 279, 312 [113 L.Ed.2d 302, 111 S.Ct. 1246] (conc. opn. of Rehnquist, C. J.)

---

[4] At the time appellant was charged with molesting K., her paternal grandfather and Alma's father-in-law, Jose M., was demanding appellant add Jose's name on the title to the property. Jose testified he had bought the property with appellant 20 years earlier but did not put his name on the title then because, having recently immigrated to the United States, he "didn't have a good social number" and had "no line of credit."

[confession may be "devastating to a defendant"].) "If the jury believes that a defendant has admitted the crime, it doubtless will be tempted to rest its decision on that evidence alone, without careful consideration of the other evidence in the case." (*Id.* at p. 313 (conc. opn. of Kennedy, J.).) "Incriminating statements from defendant's own tongue are most persuasive evidence of his guilt . . . ." (*People v. Matteson* (1964) 61 Cal.2d 466, 470 [39 Cal.Rptr. 1, 393 P.2d 161], overruled on another point in *People v. Cahill* (1993) 5 Cal.4th 478, 509, fn. 17 [20 Cal.Rptr.2d 582, 853 P.2d 1037].) Indeed, the condemning power of a confession is so strong that even a nontestifying *codefendant's* statement that implicates the defendant must be sanitized to remove references to the defendant in order to avoid the codefendant's statement from spilling over onto the defendant. (*Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620]; *People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265], superseded by constitutional amendment as stated by *People v. Fletcher* (1996) 13 Cal.4th 451, 465 [53 Cal.Rptr.2d 572, 917 P.2d 187].) Our legal system requires sanitization of a codefendant's statement because courts accept that jurors cannot be expected to wipe from their minds knowledge that a codefendant has confessed even when a trial court instructs them to do so. (*Bruton*, at pp. 129–137.) Surely, if trial courts must protect a defendant's jury from improper admission of a codefendant's statement, an even more compelling case exists for protecting the jury from the defendant's unadmitted statements that may be tantamount to a confession.[5]

Detective Serrata's misconduct echoes that in *People v. Bentley* (1955) 131 Cal.App.2d 687 [281 P.2d 1], disapproved on another point in *People v. White* (1958) 50 Cal.2d 428, 431 [325 P.2d 985]. In *Bentley*, the defendant stood trial for lewd acts against a minor. The investigating officer testified he questioned the defendant one week after the alleged offense, but the defendant denied touching the child. The officer then volunteered in the jury's presence that he " 'went on to question [the defendant] about activities he had been involved in in 1942 when he had been a suspect in another case,' " which he also denied. (*Bentley*, at p. 689.) The trial court granted the defendant's motion to strike the volunteered statement and instructed the jury to disregard it, but the court denied the defendant's motion for mistrial. On appeal following his conviction, the appellate court reversed. It explained: "It is obvious from the record that the police officer deliberately made the statement about defendant being a suspect in another case in 1942 with the idea in mind of prejudicing defendant. There can be no doubt that the statement was highly prejudicial. . . . The court struck out the objectionable

---

[5] Our research has found no cases, and the parties have cited none, where a curative instruction was sufficient to remedy a witness's improper volunteering of a defendant's inadmissible confession.

statement of the officer but the damage had been done and could not have been cured by the court's admonition. The mere direction that the testimony should be disregarded was no antidote for the poison that had been injected into the minds of the jurors." (*Bentley*, at p. 690.)

■ Respondent asserts the court's instructions to the jury cured the damage from Detective Serrata's misconduct. Respondent pins the feasibility of curing the damage on the fact Serrata did not use the word "confession," uttering only the word "statement" instead. Respondent adds further that Detective Serrata did not disclose the statement's contents and got away with referring to it only once before the court cut him off. We note that a trial court can almost always cure the prejudice of an improperly volunteered statement by granting a motion to strike and charging the jury with an appropriate curative instruction. (See, e.g., *People v. Ledesma* (2006) 39 Cal.4th 641, 683 [47 Cal.Rptr.3d 326, 140 P.3d 657] [witness's volunteered statement that defendant is being retried after previous conviction ·was overturned not incurably prejudicial]; *People v. Avila* (2006) 38 Cal.4th 491, 573–574 [43 Cal.Rptr.3d 1, 133 P.3d 1076] [improper reference to defendant's recent imprisonment curable]; *People v. Valdez* (2004) 32 Cal.4th 73, 124 & fn. 25 [8 Cal.Rptr.3d 271, 82 P.3d 296] [police officer's inadvertent disclosure he had interviewed defendant in prison did not warrant mistrial because reference to defendant's prior incarceration was brief and isolated].) Here, however, Detective Serrata told the jury that appellant's inadmissible statement was the principal reason he decided not to have the swabs tested for DNA. As noted above, even a single reference to an inadmissible confession can be the sort of "exceptional circumstance" that supports granting a mistrial because a curative instruction cannot undo the prejudice to the defendant. (Accord, *Arizona v. Fulminante, supra,* 499 U.S. 279; see *People v. Williams, supra,* 16 Cal.4th at p. 211; *People v. Wharton, supra,* 53 Cal.3d at p. 565; *People v. Bentley, supra,* 131 Cal.App.2d at p. 690.) A witness's ambiguous and inadvertent reference to a defendant's out-of-court statement previously excluded by the court may not always require the granting of a mistrial. Here, Detective Serrata's testimony was neither ambiguous nor inadvertent; it was deliberate, triggered seemingly by his apparent pique at the court's wondering the previous day about the detectives' credibility when the court granted appellant's motion to suppress. For that ruling, Detective Serrata admitted he was "going to show" the court. We do not reverse because Detective Serrata's misconduct was willful, but his willfulness reveals the effect he hoped his misconduct would have on the jury. He *intended* to tell the jury about appellant's statement because he *intended* to prejudice the jury against appellant. On one point we agree with the detective: His misconduct more likely than not achieved the effect he

sought. But for the price of his success, Detective Serrata cost the court, the parties, and the public the time and expense of a retrial.

## B. *Need Not Address Other Purported Errors*

### 1. *Admission of Forensic Nurse's Hearsay Evidence*

Police took K. to a forensic nurse a few hours after her mother found her with appellant. In addition to examining K. to "make sure [she was] medically okay," the nurse examined K. "to help the police department with their investigation, to collect any potential evidence, document injuries, meaning collect evidence, like collect swabs of potential D.N.A. from the suspect, whether it be saliva or semen." Before examining K., the nurse asked K., who did not testify at trial, what happened to her. K. responded, "I was looking up in the van. I could see his neck." Appellant moved to exclude the nurse's recitation of K.'s response as inadmissible hearsay in violation of appellant's right to confront witnesses against him under *Crawford v. Washington* (2004) 541 U.S. 36, 53–54 [158 L.Ed.2d 177, 124 S.Ct. 1354]. The court ruled it would allow K.'s answer into evidence because the purpose of the nurse's question to K. was not testimonial, but to provide medical care. Because we are reversing on other grounds, we need not address appellant's contention that the court erred.

### 2. *Uncharged Past Offenses*

Over appellant's objection, the court allowed the testimony of three women related to appellant who accused him of having molested them more than 20 years earlier when they were young girls. They described more than a half-dozen incidents in the early- to mid-1980's, when they varied in ages between about four and nine years old and appellant touched their outer genitals or buttocks with his hand or penis, and according to one of the women, partially inserted his penis one time inside her vagina. Appellant was never arrested or tried for any of the alleged molestations. Appellant contends the court abused its discretion in allowing the evidence because the court did not weigh its prejudicial value against its probative value. Additionally, appellant contends the purported offenses were too remote in time, rendering their probative value negligible when compared to their prejudicial impact. Because we are reversing on other grounds, we need not address appellant's contention, as the trial court will again have to engage in the proper weighing process.

## DISPOSITION

The judgment is reversed and the matter is remanded for retrial.

Flier, J., and Bigelow, J., concurred.